BARBARA SCHNEIDER

*v.*

PETER BECKER.

*Filed at Ottawa May 9, 1888.*

RESULTING TRUST—*bill to establish, and for an accounting.* This case states the evidence, facts and circumstances relied on for establishing a resulting trust for an interest in land, and for an accounting, upon bill filed many years after the trust was claimed to have arisen, from which this court is unable to say that a decree dismissing the bill is erroneous.

APPEAL from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

Mr. EDWARD ROBY, for the appellant.

Mr. G. W. STANFORD, for the appellee.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

This was a bill in chancery, in the circuit court of Cook county, to enforce an accounting by an alleged trustee, as to an undivided part of a certain farm, and to require a conveyance of the legal title to such share of the land to the *cestui que trust*, as well as the payment of such moneys as should be given to her by virtue of the trust. The defendant denied, by his answer, that he held the title in trust, set up that the claim was stale, and that the complainant and the defendant's grantor had an accounting and a settlement, upon which complainant released all her claims and demands alleged in the bill. The court, upon final hearing, on proofs taken, dismissed the bill for want of equity, and the complainant took this appeal.

The following facts appear: In 1829 Wendel Becker died in Prussia, leaving him surviving, his widow, Susannah, and six children, named Wendel, Mary, Peter, Joseph, Lena, and

Barbara. In 1852 or 1853 the estate of the deceased was sold and converted into money, the whole of the estate amounting to about $3200, making each child's share about $533. Joseph, Peter and Barbara had come to America, and in the spring of 1852 or 1853, the widow, Susannah, and Wendel and Lena, came to the United States, bringing with them the residue of the father's estate, except her portion which had been paid to Mary, and part of his share which had been paid to Joseph. Peter met the widow, Wendel and Lena in New York, and went with them to Sheboygan, Wisconsin, where Joseph was residing. Upon their arrival, Barbara, who was then married, and had become Mrs. Schneider, was living in Cincinnati, carrying on a millinery and dress-making business there, and she came to Sheboygan to see her mother and brother and sister. There, Wendel and the mother paid to Joseph the residue of his share of the father's estate, out of the money which they had brought with them. They offered to pay to Barbara her share, but she declined to receive it, preferring to let it remain with them. She remained there about two weeks. In the fall after, Wendel and Peter bought the farm in controversy, situate in Cook county, Illinois, consisting of two hundred and eighty acres, at $12 an acre, making $3360. The claim is, that Barbara's share of her father's estate went into the purchase of this farm. The deed was taken in the name of Wendel, and Wendel, Peter, Lena, and the mother, immediately moved upon the farm, and continued to live upon it. Lena was married to Louis Munch in 1859, and after that lived one year more upon the farm. Wendel, in whose name the title was, afterwards, in 1869, conveyed the farm to Peter Becker, and this bill was filed by Barbara Schneider, against Peter Becker, on July 24, 1883.

There is no direct evidence that any money of appellant went into the purchase of the farm in controversy. The most that appellant can say is, that she left her share of her father's estate in Wendel's hands, to be invested when he bought. The

material evidence in support of the bill is chiefly of witnesses testifying to alleged declarations of appellee. The witness Mary Imhoff, who was the hired-girl of appellant, speaks of a conversation in 1874 she heard between appellant and appellee in Chicago, about her share in the farm on which he lived, and heard her ask him for her share, ($2750,) with interest, and he said he didn't have the money at the time, but the land was out there; and she speaks of another conversation of like import, in 1876. Julia Strausser, who was then a sewing girl for appellant, speaks of the same conversation that the former witness did, as occurring in 1874, and heard the same about appellant asking $2750 of appellee. These witnesses were testifying to what occurred twelve or fourteen years before, when the latter witness was but thirteen years old, and both saying they had not talked with appellant about the matter until the day before. Rosina C. Rider testifies to a conversation in 1863 or 1864, in which appellee made appellant an offer for her share in this farm, saying he would give her $2750. "She said, well, you bring the money, and then the share will be yours, and then she laughed." Lizzie Smith, the daughter of appellant, testifies substantially the same as the foregoing witnesses, relative to the offer of $2750 for appellant's interest in the farm. This is substantially the strength of appellant's case, as resting upon admissions of appellee.

Wendel and the mother had deceased before the bringing of this suit. Much of the testimony in the record is of declarations made by them, which was received subject to objection. The declarations of the mother, evidently, were not competent. Whether those of Wendel were, it is not material to consider, for if they be received, we would regard them as bearing, in their preponderance, rather against than in favor of appellant. The only witness who had actual knowledge on the subject, was appellee, who did the negotiating for the purchase, and was present when the purchase of the farm was made and the purchase money paid. He testifies positively

that no money of appellant went into the purchase, but that all of the purchase money was furnished by Wendel, Lena and himself; and he contradicts all the testimony of appellant's witnesses with respect to his declarations. Lena, one of the parties to the purchase, and who had all the means of knowledge that one could have who was not present and saw the purchase money paid, testifies positively that Wendel, Peter and herself furnished all of the purchase money for the farm. After having lived on the farm for many years with Wendel and Peter and her mother, and after getting married, she sold out her interest in the farm to Joseph, and when she comes to sell, she sells, not a one-fourth interest, but a one-third interest. Appellee and Lena do not concur with appellant in her statement that she left the money to be invested in any land, but say that appellant simply left the money in Wendel's hands, not wishing to take it to Cincinnati. It was natural that Wendel, Peter and Lena, being practical farmers, and Peter unmarried and having lived some time in this country, should together buy a farm and go and live upon it with their mother, and carry it on together. Appellant, living in Cincinnati, and carrying on the millinery business there, would not be likely to wish to engage in farming in Cook county, in this State, or to invest in a farm there.

The point is made that the shares of Wendel, Peter and Lena, in their father's estate, were not sufficient for the purchase of the farm, and that to make up the amount of $3360, (the purchase money,) appellant's share was required, and it must, of necessity, have constituted a part of the purchase price. It appears by uncontradicted evidence, that Wendel and Lena had, besides their share in their father's estate, about $1500, savings from their upwards of twenty years of service in Germany, from the time of the death of the father to the year they came to America. Peter says he had some property and money besides his share. This would seem to make out sufficient of money which Wendel, Peter and Lena had for making

the purchase, without there being occasion for the use of any of appellant's money for the purpose. After leaving Sheboygan, appellant returned to Cincinnati, and did not appear in Cook county until some nine years afterwards. The testimony is, that about $500 a year profits was realized from the farm. If appellant's money had been invested in this farm, and she was the owner of a one-fourth interest in it, it is natural there would have been, during these nine years, some communication in writing pertaining thereto,—that there would have been inquiries made, and letters to her having some reference to the matter; but not a line in writing, in any way referring to the subject, is shown in evidence.

It appears that appellant had large money transactions with her brother Wendel, and that she had in his hands a large amount in money. She had a settlement with him in 1876, and received a deed from him of two houses and lots in Chicago, for $7500 each, subject each to a mortgage of $2500, and of the east half of a certain ten acres of land near Chicago. This property was considered as one-half of the land received by Wendel in exchange for a mill property in Minnesota. At the time, appellant executed a release to Wendel. The release is lost. A disinterested witness who was present at the time, says the settlement was not confined to the mill property, but embraced money appellant had in Wendel's hands, and is explicit in the statement that the release given was one in full of all claims and demands against Wendel. Appellant says the settlement related to the mill property they had owned together in Minnesota, and was confined thereto,—that the release did not embrace this land matter. This bill was not filed until after the death of Wendel and the mother, and was filed thirty years after the transaction of the purchase of the farm. There was an oral examination of the witnesses in the court below, and of course that court had a better opportunity than we have to judge of the credibility of witnesses.

We have not attempted to give, or to discuss in any detail, the voluminous evidence in this record. We have but referred to portions of it, stating some considerations naturally arising thereon. The whole testimony has been carefully considered, and we must content ourselves with stating further but our conclusion therefrom. Upon an examination of the entire evidence in the case, we can not say the decree is so clearly against the evidence as to require its reversal by a court of review, and it must therefore be affirmed.

*Decree affirmed.*